**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| CONNIE SUE HINTON-SALVATELLI, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 23-1127-SRF |
| | ) | |
| FRANK BISIGNANO,[1] | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

---

Gary Linarducci, Esquire, Wilmington, DE.

Attorney for Plaintiff.

Quinn Niblack-Doggett, Special Assistant United States Attorney, Office of Program Litigation, Social Security Administration, Baltimore, MD; Brian C. O'Donnell, Associate General Counsel, Social Security Administration, Baltimore, MD.

Attorneys for Defendant.

---

# MEMORANDUM OPINION

October 21, 2026
Wilmington, Delaware

[1] Frank Bisignano is now the Commissioner of Social Security and is substituted as the defendant in this action pursuant to Rule 25(d) of the Federal Rules of Civil Procedure.

**FALLON, U.S. MAGISTRATE JUDGE:**[2]

Plaintiff Connie Sue Hinton-Salvatelli ("Plaintiff") filed this action pursuant to 42 U.S.C. § 405(g) against the Commissioner of the Social Security Administration (the "Commissioner"), seeking judicial review of the Commissioner's final decision denying Plaintiff's claim for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act ("Act"), respectively, 42 U.S.C. §§ 401–433 and 1381-1383f. (D.I. 2) The court has jurisdiction pursuant to 42 U.S.C. § 405(g).

Presently before the court are cross-motions for summary judgment filed by Plaintiff and the Commissioner. (D.I. 9; D.I. 16)[3] Plaintiff asks the court to "enter judgment under sentence four of 42 U.S.C. § 405(g), reversing [the Commissioner's] final decision with a remand for a rehearing, i.e., for further administrative proceedings." (D.I. 10 at 21) The Commissioner asks the court to affirm the administrative decision denying Plaintiff's claim for benefits. (D.I. 17 at 12) For the following reasons, Plaintiff's motion for summary judgment is GRANTED-IN-PART, the Commissioner's cross-motion for summary judgment is DENIED, and the case is REMANDED for further proceedings.

## I. BACKGROUND

### A. Procedural History

Plaintiff protectively filed applications for DIB and SSI on August 1, 2019 and October 4, 2019, respectively, alleging disability starting on March 29, 2019 due to an anxiety disorder, depression, paralysis, stroke, hand/wrist problems, back problems, and ankle problems. (D.I. 7 at 314-17) Her claims were denied initially in December of 2020 and on reconsideration in June

---

[2] In January of 2024, the parties consented to the jurisdiction of the magistrate judge to conduct all proceedings in this case including trial, the entry of final judgment, and post-trial proceedings. (D.I. 13)

[3] The briefing on the pending motions is found at D.I. 10, D.I. 17, and D.I. 18.

of 2021. (*Id.* at 86-87, 104-05) At Plaintiff's request, an administrative law judge ("ALJ") held a hearing on September 20, 2022. (*Id.* at 48-85) The ALJ issued an unfavorable decision on October 6, 2022, finding that Plaintiff could perform her past relevant work as a medical biller at a light exertional level. (*Id.* at 30-39) The Appeals Council denied Plaintiff's request for review on August 15, 2023, making the ALJ's decision the final decision of the Commissioner. (*Id.* at 9-13) Plaintiff brought this civil action on October 10, 2023. (D.I. 2)

**B. Medical Evidence**

Plaintiff suffered a stroke in October of 2012. (D.I. 7 at 36; D.I. 7-1 at 255, 318) She was laid off from her job as a medical biller in March of 2019. (D.I. 7-1 at 302, 323) The ALJ identified the residual effects of Plaintiff's stroke as her only severe impairment and designated Plaintiff's bipolar disorder, posttraumatic stress disorder ("PTSD"), and generalized anxiety disorder as "nonsevere." (D.I. 7 at 33) The court's summary of the medical record is focused on evidence of Plaintiff's manipulative and mental impairments, which are the subject of Plaintiff's motion for summary judgment.

**1. Treatment records**

In June of 2019, Plaintiff was seen by a nurse practitioner to obtain a referral to a neurologist. Notes from the visit disclose Plaintiff's complaints of frequent falls, imbalance, weakness and tingling in her left hand, ankle, and foot, and anxiety. (D.I. 7-1 at 255) On examination, Plaintiff was oriented and exhibited appropriate mood and affect. (*Id.*)

Plaintiff saw physician assistant James Lust in December of 2020 for worsening spasticity and tremors on her left side, as well as falling incidents and difficulties with her memory. (*Id.* at 323) Plaintiff's mental status examination indicated she was oriented, attentive, and not easily distracted with adequate memory and normal mood, affect, and judgment. (*Id.* at

324) Plaintiff's motor examination revealed some abnormal findings in her left upper extremity, including 4/5 strength, abnormal coordination without involuntary movements, and decreased dexterity with rapid movements. (*Id.* at 325) Findings in Plaintiff's right upper extremity were normal. (*Id.*) Lust ordered a brain MRI. (*Id.*)

MRI results from March of 2021 revealed abnormal findings, including an area of permanent brain damage in the right temporal lobe and right periventricular white matter, as well as some scattered bilateral white matter lesions. (*Id.* at 321, 327-28) In a subsequent visit with Lust on March 19, 2021, he confirmed that no acute abnormalities or evidence of new strokes appeared in the MRI results. (*Id.* at 321-22) Lust prescribed Baclofen to treat Plaintiff's muscle spasms. (*Id.* at 322) When Plaintiff saw Lust again on April 30, 2021, she reported that her muscle spasms improved with Baclofen. (*Id.* at 316)

In May of 2021, Plaintiff saw nurse practitioner Patricia Rowley to establish care with the provider. (D.I. 7-2 at 71) Plaintiff reported left-sided weakness, but an examination revealed normal muscle tone and 4/5 strength in her left upper extremity. (*Id.* at 72)

In August of 2021, Plaintiff was diagnosed with carpal tunnel syndrome in her left hand. (D.I. 7-1 at 512) She described numbness and tingling in her left hand that began prior to her stroke, and she complained of worsening symptomology and the inability to feel items in her hand. (*Id.*)

On November 8, 2021, Lust indicated that Plaintiff's spasticity and tremor on her left side had improved and no longer disturbed her sleep. (*Id.* at 541) Plaintiff could move her left upper extremity without difficulty and she had normal coordination without involuntary movements. (*Id.* at 543) The results of Plaintiff's mental status examination were normal. (*Id.* at 542)

Rowley's treatment records from May of 2022 indicate that Plaintiff exhibited weak grasp on her left side. (D.I. 7-2 at 13) Lust's treatment notes from the same month reiterate that Plaintiff saw improvement in her muscle spasms with Baclofen and she denied any side effects from the medication. (*Id.* at 117) Plaintiff exhibited normal strength and motor function in her right upper extremity and 4/5 strength and decreased dexterity in her left upper extremity. (*Id.* at 120) By August of 2022, Plaintiff exhibited normal strength and motor function in both her right and left upper extremities. (*Id.* at 115)

**2. Medical opinions**

On October 15, 2019, physician assistant Clinton Glass completed both mental and physical capacity evaluations for Plaintiff. (D.I. 7-1 at 275-79) On the mental capacity form, Glass represented that Plaintiff exhibited mostly moderate or marked limitations in categories under the four "Paragraph B" criteria due to her diagnoses of bipolar disorder, PTSD, and generalized anxiety disorder: (1) understanding, remembering or applying information; (2) concentration, persistence, or maintaining pace; (3) adapting or managing oneself; and (4) interacting with others. (*Id.* at 275-77); *see also* 20 C.F.R. § 404.1520a(c)(3). In his narrative description, Glass stated that Plaintiff has difficulties with concentration, organization, and completing tasks, she is easily agitated and distracted, and she responds poorly to criticism. (*Id.* at 276-77) In the physical assessment, Glass estimated that Plaintiff could engage in repetitive reaching, handling, or fingering 35 percent of the workday with her right hand and 20 percent of the workday with her left hand. (*Id.* at 278)

Dr. Karen Sciascia performed a consultative examination in October of 2020 to assess Plaintiff's complaints of anxiety, depression, paralysis, stroke, hand/wrist problems, and other musculoskeletal problems. (D.I. 7-1 at 297-302) With respect to Plaintiff's mental diagnoses,

Dr. Sciascia noted no visible signs of anxiety and intact memory, concentration, insight, judgment, and general fund of knowledge. (*Id.* at 299) Plaintiff reported having difficulty tolerating other people, managing her fears, and maintaining attention. (*Id.* at 302) However, Dr. Sciascia did not observe any issues with Plaintiff's attention span upon examination. (*Id.*)

Dr. Sciascia also found no significant limitations in Plaintiff's physical capacity assessment. Plaintiff exhibited full motor strength in her wrist flexion, wrist extension, finger abduction, and grip strength, and her muscle tone was intact with no measured asymmetry or atrophy. (*Id.* at 300) Plaintiff exhibited no lifting or carrying limitations or restrictions, her fine manual motor dexterity was intact, and Plaintiff completed digit-to-digit testing "without difficulty or dyscoordination." (*Id.*) Range of motion testing indicated somewhat reduced range of motion in Plaintiff's left wrist, but normal bilateral findings in her elbow and hands. (*Id.* at 301) Dr. Sciascia observed that Plaintiff "has a tendency to keep her left arm flexed and tucked to her side and hand in a fist" when she performed tasks. (*Id.* at 300) Nonetheless, Dr. Sciascia concluded that Plaintiff "is certainly able to manipulate her left hand and her left foot." (*Id.* at 302)

On December 11, 2020, State Agency consultative psychologist Joseph Keyes, Ph.D. performed a psychological evaluation of Plaintiff. (*Id.* at 305-10) During the assessment, Plaintiff exhibited normal abstract thinking skills, memory, and attentional processes. (*Id.* at 306) Her orientation and mental alertness were normal, and her affect and social and interpersonal skills were appropriate. (*Id.* at 307) Plaintiff described her mood as depressed, anxious, scared, and irritable, but she reported that her medications keep her from overreacting or becoming too upset. (*Id.*) Dr. Keyes found mild limitations in Plaintiff's ability to relate to other people, restriction of daily activities, and constriction of interests. (*Id.* at 309) He also

found mild limitations in Plaintiff's ability to sustain work performance and attendance in a normal work setting, cope with the pressures of ordinary work, and perform routine, repetitive tasks under ordinary supervision. (*Id.* at 310)

Psychiatric nurse practitioner Dorothy Eyong completed a mental impairment questionnaire assessing the Paragraph B criteria in May of 2022. (D.I. 7-1 at 607-10) Eyong determined that Plaintiff had marked limitations in her understanding and memory based on Plaintiff's statements that she is not able to remember things, which makes her nervous. (*Id.* at 607) Eyong also relied on Plaintiff's statement that she has difficulty multitasking and working with others to support her finding that Plaintiff had several marked and moderate limitations in her persistence and ability to sustain concentration. (*Id.* at 607-08) In the area of social interaction, Eyong represented that Plaintiff exhibited mostly moderate limitations based on her history of bipolar and anxiety disorders. (*Id.* at 608) Finally, Eyong noted that Plaintiff's ability to adapt or manage herself was limited by her marked inability to respond appropriately to changes in the work setting. (*Id.* at 609)

During the same month, Lust completed a physical impairment questionnaire indicating that Plaintiff exhibited left-sided weakness, fatigue, poor balance, and cognitive difficulty, and her medications caused drowsiness and cognitive slowing. (*Id.* at 613-14) According to Lust's assessment, Plaintiff could not use her left hand, fingers, or arm at all, and she could only use her right hand, fingers and arm 50% of the time during a normal workday. (*Id.* at 614) Nurse practitioner Patricia Rowley completed the same questionnaire days later and confirmed that Plaintiff had limitations in performing repetitive reaching, handling, or fingering, but she was not able to specify the percentage of time during a normal workday that Plaintiff would be able to reach, handle, or finger with her right and left upper extremities. (*Id.* at 619)

Plaintiff's medical records were also reviewed by State Agency physicians and psychologists. In December of 2020, a State Agency psychologist assessed Plaintiff's mental health records and determined that she demonstrated only mild limitations in the Paragraph B criteria. (D.I. 7 at 91) The State Agency psychologist noted that findings from Plaintiff's consultative examination were within normal limits, and she had no intensive mental health treatment. (*Id.*) A review of records regarding Plaintiff's physical impairments indicated that Plaintiff could lift or carry 20 pounds occasionally and 10 pounds frequently, and she otherwise had no manipulative limitations and no restrictions in her ability to push or pull in her upper extremities. (*Id.* at 92-93) It was noted that Plaintiff's post-stroke medical records reflected normal strength, reflexes, and sensation, with only mild contractures. (*Id.* at 93)

Another review by State Agency doctors on June 21, 2021 reiterated the conclusions from December of 2020. (*Id.* at 106-13) The State Agency psychologist determined that Plaintiff had only mild limitations in the Paragraph B criteria, observing that there were no new allegations since the prior assessment in December of 2020 and the additional medical records did not reflect any change or worsening of Plaintiff's functioning. (*Id.* at 111) The State Agency physician assessing Plaintiff's physical impairments emphasized the results of Plaintiff's consultative examination showing that Plaintiff's tendency to keep her left hand in a fist did not impact her dexterity or motor strength. (*Id.* at 110)

### C. Hearing Before the ALJ

#### 1. Plaintiff's testimony

During the hearing before the ALJ on September 20, 2022, Plaintiff testified that she had a stroke in October of 2012, but her employer allowed her to return to work in a new position that required her to review doctors' notes for proper insurance coding in a medical billing

context. (D.I. 7 at 58-59) In this position, Plaintiff was sometimes required to lift and carry boxes of medical records weighing between 30 and 50 pounds. (*Id.* at 60) Plaintiff testified that, after her stroke, her pace at work was slower and she was unable to consistently complete tasks on time. (*Id.* at 61-62) She stated that people at work treated her differently after her stroke, and her ability to focus and concentrate to achieve the same level of accuracy and precision was diminished. (*Id.* at 63-64) Plaintiff held this position for seven years until she was terminated in 2019 for sending several mailings to the wrong addresses in violation of the Health Insurance Portability and Accountability Act ("HIPAA"). (*Id.* at 60)

Plaintiff testified that she has had limited mobility in the fingers on her left hand since she had her stroke. (*Id.* at 65) This limitation made it difficult for Plaintiff to type, and she adjusted by using only her right hand on the keyboard. (*Id.* at 65-66) She also has some difficulty with activities of daily living, such as doing her hair, due to the limited mobility in her left hand. (*Id.* at 66) Plaintiff does not experience pain in her left hand. (*Id.*)

Plaintiff also testified that her mental impairments make it difficult for her to concentrate for more than 20 minutes at a time. (*Id.* at 71-72) She cannot multitask as she did in the past, and she was often stressed out and nervous at work. (*Id.* at 72-73) Plaintiff required frequent breaks at work to manage these symptoms, and she found being around other people to be frustrating. (*Id.* at 73-75)

**2. Vocational expert's testimony**

The ALJ posed the following hypothetical to the vocational expert ("VE"):

> Assume a hypothetical individual that could perform a restricted range of light. This individual could occasionally lift 20 pounds, frequently lift ten, could stand and/or walk six hours out of an eight-hour workday, could sit six hours out of an eight-hour workday, could frequently climb ramps and stairs, could never climb ladders, ropes, or scaffolds, could frequently balance, stoop, kneel, crouch, and crawl, and can tolerate frequent exposures to hazards such as machinery and

> heights. Could this hypothetical individual perform any of the Claimant's past work?

(D.I. 7 at 77) The VE testified that such a claimant would be able to perform her past job as a medical biller under Dictionary of Occupational Titles ("DOT") #079.262-014. (*Id.*)

Under questioning from Plaintiff's counsel, the VE testified that Plaintiff would not be able to perform her past relevant work as a medical biller if she could occasionally use her left non-dominant hand to handle and finger. (*Id.* at 80) The VE also opined that an individual would be precluded from competitive employment if the individual was off task 10% or more of the time for skilled work and 5% or more of the time for unskilled work. (*Id.*) Absences more than one day per month for an unskilled worker and one and a half days per month for skilled workers would also be work preclusive. (*Id.* at 81) Finally, the VE opined that the hypothetical individual would be precluded from competitive employment if the individual had marked or occasional limitations in her ability to sustain an activity and relate appropriately to coworkers or supervisors. (*Id.* at 82)

**D. The ALJ's Findings**

Based on the medical evidence in the record and the testimony by Plaintiff and the VE, the ALJ determined that Plaintiff was not disabled under the Act for the relevant time period from the March 29, 2019 onset date through the date of the ALJ's decision. (D.I. 7 at 39) The ALJ found, in pertinent part:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2024.

2. The claimant has not engaged in substantial gainful activity since March 29, 2019, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3. The claimant has the following severe impairment: status/post cerebral vascular accident (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except frequently climb ramps/stairs, but never climb ladders/ropes/scaffolds, and frequently balance, stoop, kneel, crouch, and crawl. The claimant can tolerate frequent exposure to hazards, such as machinery and heights.

6. The claimant is capable of performing past relevant work as a Medical Coder Biller. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

7. The claimant has not been under a disability, as defined in the Social Security Act, from March 29, 2019, through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).

(*Id.* at 32-39)

## II. STANDARD OF REVIEW

Judicial review of the ALJ's decision is limited to determining whether substantial evidence supports the decision. *See* 42 U.S.C. §§ 405(g), 1383(c)(3); *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). "Substantial evidence means enough relevant evidence that 'a reasonable mind might accept as adequate to support a conclusion.'" *Pearson v. Comm'r of Soc. Sec.*, 839 F. App'x 684, 687 (3d Cir. 2020) (quoting *Biestek*, 139 S. Ct. at 1154). When applying the substantial evidence standard, the court "looks to an existing administrative record and asks whether it contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek*, 139 S. Ct. at 1154 (citing *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). The threshold for satisfying the substantial evidence standard is "not high[,]" requiring "'more than a mere scintilla'" of evidence. *Biestek*, 139 S. Ct. at 1154. Additionally, when reviewing the record for substantial evidence, "we are mindful that we must not substitute our own judgment

for that of the fact finder." *Zirnsak v. Colvin*, 777 F.3d 607, 611 (3d Cir. 2014).

## III. DISCUSSION

### A. Disability Determination Process

Title II of the Social Security Act "provides for the payment of insurance benefits to persons who have contributed to the program and who suffer from a physical or mental disability." *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987). Title XVI of the Social Security Act provides for the payment of disability benefits to indigent persons under the SSI program. 42 U.S.C. § 1382(a). A disability is defined for purposes of SSI and DIB as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A claimant is only disabled if the impairments are so severe that they preclude a return to previous work or engagement in any other kind of substantial gainful work existing in the national economy. *Id.* at § 423(d)(2)(A); *Barnhart v. Thomas,* 540 U.S. 20, 21-22 (2003).

The Commissioner must perform a five-step analysis to determine whether a person is disabled. *See* 20 C.F.R. §§ 404.1520, 416.920; *Plummer v. Apfel*, 186 F.3d 422, 427-28 (3d Cir. 1999). If the Commissioner makes a finding of disability or non-disability at any point in the sequential process, the Commissioner will not review the claim further. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4)(i). At step one, the Commissioner determines whether the claimant is engaged in any substantial gainful activity. *See id.* at §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). If the claimant is not engaged in substantial gainful activity, step two requires the Commissioner to determine whether the claimant is suffering from a severe impairment or a severe combination of impairments. *See id.* at §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).

If the claimant's impairments are severe, at step three, the Commissioner compares the claimant's impairments to a list of impairments that are presumed severe enough to preclude any gainful work. *See id.* at §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii); *Plummer*, 186 F.3d at 428. When a claimant's impairment or its equivalent matches a listed impairment, the claimant is presumed disabled. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). If a claimant's impairment, either singly or in combination, fails to meet or medically equal any listing, the analysis continues to steps four and five. *See id.* at §§ 404.1520(e), 416.920(e).

At step four, the ALJ considers whether the claimant retains the residual functional capacity ("RFC") to perform past relevant work. *See id.* at §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv); *Plummer*, 186 F.3d at 428. A claimant's RFC "measures the most she can do despite her limitations." *Zirnsak v. Colvin*, 777 F.3d 607, 611 (3d Cir. 2014) (quoting 20 C.F.R. § 404.1545(a)(1)) (internal quotations and alterations omitted). The claimant bears the burden of demonstrating the inability to return to past relevant work. *See Plummer*, 186 F.3d at 428

If the claimant is unable to return to past relevant work, at step five, the Commissioner must demonstrate that the claimant's impairments do not preclude an adjustment to any other available work. *See* 20 C.F.R. §§ 404.1520(g), 416.920(g); *Plummer*, 186 F.3d at 428. In other words, the Commissioner must prove that "there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with her medical impairments, age, education, past work experience, and [RFC]." *Plummer*, 186 F.3d at 428. The ALJ must analyze the cumulative effect of all the claimant's impairments in determining whether he or she is capable of performing work and is not disabled. *See id.* The ALJ often seeks the VE's assistance in making this finding. *See id.*

### B. The ALJ's Reliance on a Nonexistent Job Title in the DOT

Relying on the testimony of the VE, the ALJ found that Plaintiff could return to her past relevant work "as a Medical Coder Biller" under "DOT #079.262-014." (D.I. 7 at 38) Plaintiff contends that this DOT provision does not exist, and the Commissioner concedes that "there may be an error in the job description number[.]" (D.I. 10 at 11-12; D.I. 17 at 7)

Remand is necessary to allow the ALJ to clarify his step four finding. There is no dispute that the DOT provision cited by the ALJ does not exist. *See Kenneth M. v. Kijakazi*, 2021 WL 3931057, at *9 (S.D. Tex. Sept. 2, 2021) (remanding the case to the ALJ where "the vocational expert relied on a specific DOT provision," DOT 079.262-014, "that does not exist."); *Miller v. Colvin*, 2017 WL 677670, at *6 (M.D. Fla. Feb. 21, 2017) (same). As explained in *Kenneth M.* and *Miller*, the ALJ's decision may only be upheld for the reasons articulated by the ALJ, and a reviewing court cannot perform an analysis missing from the ALJ's decision to remedy an error. *Id.* Here, the ALJ "determined that the vocational expert's testimony is consistent with the information contained in the [DOT]," and the ALJ's conclusion that Plaintiff was able to perform her past relevant work was "based upon the testimony of the vocational expert." (D.I. 7 at 39) "Because the ALJ's decision must stand or fall on the reasons stated . . . it is not appropriate for this Court to substitute its opinion for what the ALJ or [VE] might have meant[.]" *Kenneth M.*, 2021 WL 3931057, at *9 (internal citations omitted).

The Commissioner argues that the ALJ was not required to rely on the VE's testimony. (D.I. 17 at 6) This argument is not persuasive because the ALJ did, in fact, rely on the VE's testimony. (D.I. 7 at 38-39) Although the VE identified other positions that Plaintiff could perform and which were listed in the DOT, the ALJ did not refer to those other positions in his decision. (*Id.* at 78-79) The court "decline[s] to engage in the *post hoc* rationalizations"

suggested by the Commissioner. *Kenneth M.*, 2021 WL 3931057, at *9; *see also Fargnoli v. Massanari*, 247 F.3d 34, 44 n.7 (3d Cir. 2001) (holding that the court may not "rely[ ] on medical records found in its own independent analysis, and which were not mentioned by the ALJ[,]" to rectify errors in the ALJ's decision).

### C. Whether the ALJ's RFC Assessment is Supported by Substantial Evidence

Plaintiff contends that the ALJ's RFC assessment is not supported by substantial evidence because the medical opinion evidence and Plaintiff's own statements describe greater limitations than those included in the RFC. (D.I. 10 at 15-21) Residual functional capacity is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a "regular and continuing basis." *See* S.S.R. 96-8p, 61 Fed. Reg. 34475. The ALJ must consider "all the relevant evidence in [the claimant's] case record" in determining the plaintiff's RFC. 20 C.F.R. § 404.1545(a). Here, Plaintiff argues that the ALJ's RFC assessment failed to account for evidence establishing her manipulative and mental limitations. (D.I. 10 at 15-21)

#### 1. Manipulative limitations

Plaintiff contends that remand is warranted because the ALJ did not include any manipulative limitations in the RFC assessment that would accommodate Plaintiff's limited use of her hands. (D.I. 10 at 15-16) But the ALJ considered the evidence cited by Plaintiff in support of this position and explained why that evidence did not credibly establish the need for manipulative limitations in Plaintiff's RFC. (D.I. 7 at 36-38) The ALJ is not required to submit to the VE "every impairment *alleged* by a claimant" so long as the ALJ "accurately convey[s] to the [VE] all of a claimant's *credibly established limitations*." *Rutherford v. Barnhart*, 399 F.3d 546, 554 (3d Cir. 2005) (emphasis in original).

In his decision, the ALJ summarized medical evidence indicating that Plaintiff experienced spasticity, left side tremors, decreased range of motion in her left wrist, and a tendency to keep her left arm flexed and tucked to her side with her hand in a fist while performing tasks. (D.I. 7 at 36) He also cited an examination in August of 2021 which noted positive provocative testing at the left wrist and spasticity of the left upper extremity, and an examination in May of 2022 that identified left-sided weakness in Plaintiff's grasp. (*Id.* at 37) But other evidence considered by the ALJ during this time period, particularly the consultative examination results from Dr. Sciascia, showed that Plaintiff had no lifting or carrying restrictions, she performed digit to digit testing without difficulty or dyscoordination, she had intact fine manual motor dexterity, and she was able to manipulate her left hand and foot and raise her arms above her head. (*Id.* at 36; D.I. 7-1 at 300-02)

The ALJ explained why he found medical opinions restricting Plaintiff's use of her hands unpersuasive. The ALJ acknowledged Glass's opinion limiting Plaintiff to handling, fingering, and reaching only 35 percent of the time with the right upper extremity and 20 percent of the time with the left upper extremity, Lust's opinion that Plaintiff could use her right upper extremity no more than 50 percent of the time and could never use her left upper extremity during a normal workday, and Rowley's opinion recommending lift/carry and manipulative restrictions. (D.I. 7 at 37-38) However, the ALJ noted that Glass, Lust, and Rowley did not explain the reasons for these proposed limitations, and those opinions were not supported by Dr. Sciascia's consultative examination results or Lust's treatment records, which showed intact fine manual motor dexterity and improvement of her symptoms with medication, respectively. (*Id.* at 37-38; D.I. 7-1 at 300; D.I. 7-2 at 115, 117)

Plaintiff argues that the ALJ improperly rejected her statements regarding the intensity,

persistence, and limiting effects of her symptoms. (D.I. 10 at 19) But the ALJ explained that Plaintiff's subjective complaints were inconsistent with her return to work after her stroke until she was laid off. (D.I. 7 at 37) The ALJ also stated that Plaintiff's medical exam records documented only mild weakness on her left side. (*Id.*) Although Plaintiff argues that her symptoms of spasticity and tremors on her left side worsened after she stopped working, the medical record cited by Plaintiff in support confirms that Plaintiff was prescribed Baclofen during that visit. (D.I. 10 at 19; D.I. 7-1 at 318-19, 322) Consistent with the ALJ's assessment that Plaintiff's symptoms improved with medication, treatment notes from the following month confirm that Plaintiff saw improvements in her left-side spasticity and tremors with Baclofen. (D.I. 7 at 38; D.I. 7-1 at 316)

The ALJ did not err in declining to include manipulative limitations in his RFC assessment because substantial evidence supports his conclusion that no such limitations were credibly established. *See Rutherford*, 399 F.3d at 554. In this case, where some medical evidence supports the inclusion of a manipulative limitation in the RFC and other medical evidence opposes such a limitation, "the ALJ has discretion to choose whether to include that limitation in the hypothetical." *Zirnsak v. Colvin*, 777 F.3d 607, 615 (3d Cir. 2014). Thus, Plaintiff's motion for summary judgment for failure to include a manipulative limitation in the RFC assessment is DENIED.

**2. Mental limitations**

Substantial evidence also supports the ALJ's conclusion that Plaintiff's non-severe mental impairments do not support the incorporation of functional limitations in her RFC assessment. The ALJ cited Plaintiff's return to work after her stroke, normal findings on multiple mental status examinations, Plaintiff's ability to manage her finances independently,

and her strong performance in school[4] to support his decision not to include mental limitations in Plaintiff's RFC. (D.I. 7 at 37-38)

Plaintiff argues that the ALJ's RFC assessment is not supported by substantial evidence because Dr. Keyes found Plaintiff had mild limitations in the Paragraph B criteria and the ALJ found this opinion persuasive, but the RFC assessment does not include any mental limitations. (*Id.* at 16-17) However, the Third Circuit has held "[t]here is no legal requirement that a physician have made the particular findings that an ALJ adopts in the course of determining an RFC." *Titterington v. Barnhart*, 174 F. App'x 6, 11 (3d Cir. 2006); *Gladden v. Berryhill*, 2018 WL 1123763, at *4 n.3 (E.D. Pa. Feb. 28, 2018) ("[T]he ALJ is not prohibited from making an RFC assessment even if no doctor has specifically made the same findings and even if the only medical opinion in the record is to the contrary."). Moreover, the ALJ was not required to include limitations in his RFC assessment based on medical evidence of mild mental impairments. *See Holley v. Comm'r of Soc. Sec.*, 590 F. App'x 167, 169 (3d Cir. 2014) (holding that there was "no compelling reason" why mild mental impairments should be included in hypothetical where claimant's evidence "was generally very thin[.]"); *Charlier v. Kijakazi*, C.A. No. 20-1327-CFC-JLH, 2022 WL 606327, at *4 (D. Del. Feb. 28, 2022) (rejecting the argument that the ALJ was required to include mental limitations in the RFC even after making a step two finding of "mild" limitations in the paragraph B criteria); *report and recommendation adopted*,

[4] Plaintiff suggests that the ALJ's finding was primarily based on her performance in school, but he provides insufficient information to support that assertion. (D.I. 10 at 19-20) But the ALJ also discredited Plaintiff's complaints due to her return to work for seven years after her stroke and the results of her medical exams. (D.I. 7 at 37) The ALJ specifically cited records from Plaintiff's primary care physician documenting Plaintiff's representation that she was focused on school, was doing well in school, and had a 3.0 average. (D.I. 7-1 at 650) The court finds no basis to support Plaintiff's assertion that the ALJ gave undue weight to Plaintiff's performance in school or that more details about the precise nature of Plaintiff's schooling were needed to determine Plaintiff's functional abilities.

2022 WL 1770336 (D. Del. June 1, 2022). At step four, the ALJ addressed symptoms of Plaintiff's mental impairments, such as cognitive decline and fatigue, and explained why those impairments did not support the inclusion of functional limitations in the RFC assessment. (D.I. 7 at 38) This decision is supported by substantial evidence, including mental status examination results showing intact memory, attention, concentration, and general fund of knowledge. (*Id.*; D.I. 7-1 at 299, 306-07, 317, 542)

Plaintiff also contends that the ALJ improperly rejected Eyong's opinion because it was based largely on Plaintiff's subjective statements. (D.I. 10 at 18) This is a sufficient reason to discount the opinion. *See, e.g.*, *Ford v. Astrue*, 2012 WL 2318983, at *6 (W.D. Pa. June 18, 2012) (upholding ALJ's decision to give little weight to opinions based largely on subjective allegations which were unsupported by objective evidence of the claimant's mental impairments); *see also Favazza v. Kijakazi*, C.A. No. 21-17-CJB, 2023 WL 3055580, at *11 n.10 (D. Del. Apr. 24, 2023) (citing *Moua v. Comm'r of Soc. Sec.*, 2022 WL 317189, at *6-8 (E.D. Cal. Feb. 2, 2022), for the proposition that an ALJ may properly reject a treating physician's opinion when it is not supported by any objective evidence despite a wealth of subjective reports by the claimant regarding his mental health limitations).

Plaintiff's remaining arguments are no more persuasive because they ask the court to reweigh the evidence and substitute its own judgment in place of the ALJ who considered the entire record in reaching his decision. *See Gaddis v. Comm'r of Soc. Sec.*, 417 F. App'x 106, 107 n.3 (3d Cir. 2011) ("Where the Commissioner's findings of fact are supported by substantial evidence, courts are bound by those findings even if they would have decided the factual inquiry differently—*i.e.*, we are not permitted to weigh the evidence or substitute our own conclusions for those of the fact-finder."). For example, Plaintiff contends that the ALJ improperly rejected

Lust's opinion regarding her mental impairments even though Lust's treatment records indicate Plaintiff suffered from cognitive limitations and fatigue. (D.I. 10 at 19) But the ALJ cites other objective evidence indicating that Plaintiff's cognitive function was normal. (*See, e.g.*, D.I. 7-1 at 299, 306-07, 317, 542) As previously stated at § III.C.1, *supra*, the ALJ may exercise his discretion in choosing whether to include a functional limitation in the hypothetical when there is conflicting medical evidence on the record. *See Zirnsak*, 777 F.3d at 615.

The ALJ did not err in declining to include mental limitations in his RFC assessment because substantial evidence supports his conclusion that no such limitations were credibly established. *See Rutherford*, 399 F.3d at 554. Thus, Plaintiff's motion for summary judgment for failure to include mental limitations in the RFC assessment is DENIED.

## IV. CONCLUSION

For the foregoing reasons, Plaintiff's motion for summary judgment is GRANTED-IN-PART, (D.I. 9), the Commissioner's cross-motion for summary judgment is DENIED, (D.I. 16), and this action is REMANDED for further proceedings.